IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2024

## DOYLE WAYNE MASON JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 120426   Steven Wayne Sword, Judge**

_____

### No. E2023-01559-CCA-R3-PC

_____

Petitioner, Doyle Wayne Mason, Jr., appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in denying his claims that trial counsel was ineffective by failing to object to the State's closing argument, failing to adequately advise him concerning the State's plea offer, and failing to move to exclude discovery received on the eve of trial. Petitioner further argues that appellate counsel was ineffective for failing to raise on direct appeal the issue of Juror 2's presence on the jury. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Gregory P. Isaacs (at post-conviction hearing and on appeal) and Michael R. Fitzgerald (on appeal), Knoxville, Tennessee, for the appellant, Doyle Wayne Mason, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme Allen, District Attorney General; and Jordan Murray, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

Petitioner was indicted for one count of aggravated sexual battery, one count of solicitation of a minor, three counts of sexual battery by an authority figure, and eleven counts each of statutory rape by an authority figure, incest, and rape. These offenses were

committed against A.L.[1] from 2012 to 2016 when she was between eleven and fifteen years old, and Petitioner was between thirty-two and thirty-five years old, until A.L. disclosed the abuse to her mother and grandmother. *State v. Mason*, No. E2019-00174-CCA-R3-CD, 2020 WL 5015903, at *1 (Tenn. Crim. App. Aug. 25, 2020).

At the close of proof at trial, the State dismissed two counts of sexual battery by an authority figure, and Petitioner was convicted as charged on all remaining counts. He was sentenced to an effective fifty-two years in confinement. *Id.* at *1, 19, and 23. This court affirmed Petitioner's convictions and sentence on direct appeal. *Id.* at *36. The relevant facts presented at trial were that Petitioner met A.L.'s mother when A.L. was "almost three years old[,]" and he lived with them and A.L.'s older half-brother for two years before Petitioner and A.L.'s mother married and moved to a house in Knoxville. *Id.* at *1.

Petitioner and A.L.'s mother eventually separated. Her mother remained in the house for financial reasons but on occasion, she stayed with her boyfriend. A.L. lived solely with Petitioner. *Id.* at *1-2. A.L. testified at trial that Petitioner was her confidant while growing up and that she trusted him more than her mother and that she "looked up to" Petitioner. She wanted "just a dad" because she did not see her biological father very often. *Id.* at *3. However, A.L.'s relationship with Petitioner changed into more of a romantic one when she was approximately eleven years old. *Id.*

A.L. testified that when she was in the sixth grade, Petitioner played a "picture game" with her during which one of them would take pictures of a body part with a handheld Nintendo device while in the bathroom, and the other person would view the photograph while in the living room and guess which part it was. *Id.* Petitioner eventually showed A.L. a picture of his penis. After A.L. ran out of "obvious" body parts to photograph, Petitioner told her, "'You know, there's something else that you haven't taken a picture of.' A.L. understood [Petitioner's] statement to mean that he wanted her to photograph her breasts." *Id.* A.L. then "photographed her bare breasts and showed the photograph to [Petitioner]." This made her feel "[v]ery uncomfortable." *Id.*

A.L. testified that Petitioner played a second game with her called the "shower game" which she described as "hide and go seek and tag put together." *Id.* at *4. On one occasion when she was eleven or twelve years old, A.L. was taking a shower when Petitioner "came in and grabbed her without warning" causing her to feel "'very confused and kind of violated[.]'" *Id.* After that, Petitioner would ask if she was "'ready'" and come into the bathroom and try to grab one of her body parts while she was in the shower. One of the rules was that Petitioner could not look inside the shower curtain. *Id.* A.L. testified

---

[1] Because it is the policy of this court to protect the identity of minor victims, we identify them by their initials.

that Petitioner grabbed her breast on more than one occasion during the shower game. The game stopped when A.L. was approximately twelve years old. *Id.*

When A.L. was between eleven and thirteen years old, Petitioner began kissing her on the lips. *Id.* They were usually in the living room when the kissing occurred and sometimes sitting on the couch watching television. *Id.* A.L. testified that Petitioner told her that they were boyfriend and girlfriend which meant they were "'supposed to do sexual things together.'" *Id.* "A.L. stated that she 'wasn't sure, but [she] just did it because that's what he told [her].'" *Id.* Petitioner also told her to keep their relationship a secret because Petitioner would get in trouble if anyone found out. A.L. trusted Petitioner because he was like a father to her. *Id.*

A.L. testified that when she was twelve or thirteen years old and in the seventh grade, she and Petitioner began doing "sexual things." *Id.* at *5. On the first occasion, she manually stimulated Petitioner's exposed penis until he ejaculated. "[T]his type of activity occurred about three times." *Id.* A.L. also testified that when she was in the sixth grade, Petitioner touched her breasts both over and underneath her clothing on one occasion while they were "making out" on the living room couch. *Id.* She also testified as to other occasions after she turned thirteen when Petitioner would touch her breasts, and "sometimes 'other things would happen too.'" *Id.* A.L. testified that Petitioner also began rubbing her vagina and that it was always "skin to skin" and never over her clothing. *Id.* He always touched inside her vagina. *Id.* The incidents occurred either in the living room or in the bedroom while she was in bed. *Id.* at *5-6.

A.L. testified that instances of fellatio began occurring when she was in the seventh grade and usually happened in the living room, Petitioner's shower, A.L.'s bedroom, Petitioner's truck, or at Petitioner's workplace. *Id.* at *6-8. She testified that this occurred "almost three times per week for about three years until she disclosed the abuse." *Id.* at *6. A.L. also said that Petitioner began performing cunnilingus on her in those same locations. She described specific incidents of fellatio and cunnilingus and where they occurred. *Id.* "A.L. testified that when she was fourteen but 'very close' to her fifteenth birthday, [Petitioner] anally penetrated her with his penis[,]" which was painful. *Id.* at *8. This occurred between five and ten times. *Id.* "A.L. testified that she and [Petitioner] never had vaginal intercourse because [Petitioner] wanted to avoid getting in trouble for having sex with a minor." *Id.* at *9.

At trial, the State introduced exhibits "documenting [Petitioner's] relationship with A.L. including drawings and notes from a computer tablet, two rings, photographs of text message conversations, condoms, and two bottles of personal lubricant." *Id.* Petitioner bought the first ring for A.L. when she was thirteen or fourteen years old, and she "understood the ring to be a 'promise that [they] would be together forever.'" *Id.* at *10.

He bought the second ring for her after the first one broke, and she understood it meant the same thing as the first one. *Id.* A.L. wore the ring daily until she disclosed the abuse. *Id.* A.L. identified a photograph of a note written by Petitioner, which reflected the following:

> I bought you a promise ring because we can't get engaged due to reasons you already know. [T]his has been a rough month for me but I still want all the things this ring stands for. I do still love you with all my heart. If you put this ring on you are saying you will not kiss, touch, flirt or do anything with any other male and will not let them do anything with you. [T]his also means you give your love, body, and mind to me. You need to show your affection to me [to] let me know you are happy with your man [sic] want him, his heart and body. [T]his also means I will have the same loyalty to you. If you do not want me, love me or if you are just saying this to play me do not take my ring. This is real not a game will you accept my ring.

*Id.* at *11 (footnote omitted).

A.L. also identified a photograph of a handwritten poem that Petitioner had slipped into her backpack stating in part: "How I loved you before you started to mature." *Id.* Additionally, Petitioner sent A.L. sexually explicit text messages, and she identified screen shots of those messages at trial and others in which she and Petitioner professed their love for each other and intent to eventually marry and have children. *Id.* at *12-14. She said that she and Petitioner "sent text messages to one another '[a]lmost all the time that [they] weren't together' beginning when she was a freshman in high school." *Id.* at *12. A.L.'s mother found "'well over a thousand' text messages exchanged between A.L. and [Petitioner] from April 13, 2016, to June 19, 2016[,]" on Petitioner's cell phone. *Id.*

During Petitioner's interview with police at his home on June 29, 2016, he denied having had sex with A.L. although her mother and father had accused him of it for "years." *Id.* at *15. Petitioner claimed that neither A.L. nor her half brother viewed him as a "father figure," and he agreed that A.L. had "[s]omewhat" of a "school-girl crush" on him and that she had "said things" to him about wanting to marry Petitioner and have sex with him when she was older. *Id.* Petitioner also said that A.L. wanted him to leave her mother, and "I told her[,] once she is eighteen . . . I ain't going to jail and losing everything I got." *Id.* Petitioner eventually admitted during the interview that he and A.L. had "kissed on the lips[,]" that she had touched his penis, and that she had slept in his bed "a few times" but no sexual activity occurred. He also admitted that his cell phone contained "some bad things." *Id.* at *17.

Rebecca Mayes, an assistant coach and "ball mom" for A.L.'s softball team, testified on Petitioner's behalf. *Id.* at *19. She never saw any inappropriate behavior

- 4 -

between Petitioner and A.L., and A.L. never reported any abuse to her although they were close and discussed A.L.'s father and mother. *Id.* Ms. Mayes "affirmed that [Petitioner] and A.L. appeared to have a close relationship and spent a lot of time together." *Id.*

*Post-conviction Hearing*

Trial counsel was deceased at the time of the post-conviction hearing. Rachel Russell, a former Knox County Assistant District Attorney General, testified that she was the lead prosecutor on Petitioner's case. She noted that Petitioner's case was pending for several years, and she had multiple interactions with trial counsel, some of which were documented through email.

Ms. Russell testified that discovery was provided to trial counsel "both in a hard copy paper form and then also the digital evidence was provided on disc." She further testified:

> To the best of my knowledge, discovery was turned over as I received it, and so as the case proceeded, there were new items that were received by the [S]tate, and as soon as I received those, I then turned those over in addition to what we had initially after the first discovery was given.

Ms. Russell identified an email she sent to trial counsel on January 23, 2018. Attached to the email were images of eleven screen shots of text messages Ms. Russell had received from A.L.'s mother; the messages were from A.L.'s phone and were exchanged between Petitioner and A.L. Ms. Russell testified that when she conducted a pretrial meeting with A.L.'s mother the week before trial, A.L.'s mother provided the text messages. Ms. Russell thought all the text messages had been previously provided to trial counsel; however, on further review, she realized she had not seen these messages. After sending the email, Ms. Russell called trial counsel and discussed the email and attached text messages with him. Ms. Russell testified that trial counsel then "mentioned the fact that he was going to have to raise it with the [c]ourt next week that I had turned those over the week prior to trial."

The new text messages were similar to messages provided by the State during the initial discovery and contained the following:

> [Petitioner]: I really hope u r not lying I really do want to make it. I hope your [sic] not as heartless as u mom and screw me over. I am a good man to u.

[A.L.]: I'm not oh want go make it to [sic] – I'm not like her.  I know you are.

[Petitioner]:   I liked that you answered the whole text thx if I put this behind us u have to promise it won't come out to be true later and when I ask for stuff then u will give it I want this and our issues to be gone forever

[A.L.]: They will be it will all be fine

[Petitioner]:   U going to give stuff when I ask for it?

[Petitioner]:   No response?

[A.L.]: Yes.

[A.L.]:  Not everything I ask for

[A.L.]: U

[Petitioner]:   No takebacks u said yes

Later, Petitioner sent a text to A.L. stating: "Love u bunches hope yesterday meant something to u it did to me[.]"  He further texted: "At least you can say u make church folks leave stuff on the fence" and "they heard you screaming and moaning lmao[.]"

In the final text messages attached to the email, Petitioner sent A.L. two additional poems.  The first one read:

Missing u thinking of my sweetheart
Hope your having a great day and hope we don't part
She is awesome and great this girl of mine
I know I will love her for all time
She is [A.L.] my one and true
My friend lover and will be my kids mother to

The second poem read:

Her smile her face I love it all
She can't really help she is 5 feet tall
We laugh we love and we r there for each other
She is the one for me I wouldn't want another

4 years ago we started with a game
Who would have known from that nothing would be the same

Based on her conversation with trial counsel, Ms. Russell did not anticipate his requesting a continuance based on the late-provided text messages. She noted that trial counsel "already had all of those other text messages, had been prepared to go forward with those text messages, and that this wouldn't impact his trial strategy or his trial approach as, you know, these were just additional to the ones that had already been turned over." It was Ms. Russell's opinion that the additional text messages would not have affected the verdict in Petitioner's case. She noted that she had no reason to doubt the authenticity of the text messages, and A.L. authenticated them at trial.

Ms. Russell testified that she and trial counsel discussed a potential plea agreement. Based on the case file, she thought the original offer was for seventy-five years. Ms. Russell reviewed an "Acknowledgement of Plea Offer and Advice of My Attorney" document signed by Petitioner which she had not seen prior to the post-conviction hearing. The document did not contain the details of the plea offer communicated to trial counsel; it was silent on the offenses, the proposed manner and length of service, and sentencing range of the offer. However, the document contained Petitioner's charged offenses and stated that his sentence could be as long as thirty years to more than sixty years. It also stated that many of the charges "required mandatory jail sentence and the sentence would be served at 100%." Ms. Russell thought that she made the plea offer to trial counsel orally. She noted that this was the "beginning stages of that offer negotiation."

On cross examination, Ms. Russell agreed that Petitioner's trial began on January 29, 2018, and she sent the email containing the text messages to trial counsel on January 23, 2018. She said that the State's initial discovery response was provided to trial counsel on December 16, 2016, and contained text messages between Petitioner and A.L., and additional text messages between the two were provided on January 12, 2018.

One of the messages provided in initial discovery contained the following:

Hope I get to enjoy you getting on your knees[.] I would like to rub or lick [ ] what's in between your thighs[.] Make you go so hard your mind blows past the sky[.] It[']s not about sex but the family and future I need[.] Although I can't wait until I get inside you and plant the seed[.]

A.L. responded: "Oh wow that was sexual[.]" Petitioner also texted the following poem to A.L.:

I love it when she gets on her knees

- 7 -

Open those lips and I am begging her please
She licks and sucks it all non stop
Until I can't take it no more and suddenly pop
It makes me happy and makes me smile
That's when I know she loves me and it[']s all worth the while

A.L. replied: "Wow that one was dirty lol[.]" In the text messages provided in discovery on January 12, 2018, Petitioner texted the following to A.L.: "U woke me to eat u didn't wake me to say sorry or to tell me u love me. You never even kissed me today. I will let u get you sleep so u rested for tomorrow[.]"

Although Ms. Russell could not recall the specifics of her conversation with trial counsel concerning the text messages provided on January 23, 2018, she said the "gist of the conversation was that we still had every intention of moving forward." She further testified:

> He had already worked on the case. It wasn't - - you know, the revelation of those text messages would not have changed the way that he was preparing for trial because, again, he had already had the rest of the discovery. He had - - was already prepared to address the text messages in general that we had already provided, as far as, you know, obviously, the authenticity and the nature of that. So, yeah, that was my understanding from speaking to him was, you know, I am going to have to put it on the record.

Ms. Russell testified that her case file indicated a "rough draft presentment" of a plea offer of seventy-five years. She said: "I - - we never got to the point that I was binding myself to a formal offer with him. Again, that - - that was customarily kind of how those went. You know, he came to me and asked for an offer, and I said, 'This is where I'm at[.]'" Ms. Russell noted that she had written down an offer of seventy-five years at 100%. She acknowledged that the charges to which Petitioner would be "required to plead to would be nonprobatable." Ms. Russell testified that the "Acknowledgement of Plea Offer and Advice of My Attorney" contained the following language:

> 11.    I acknowledge that my attorney has advised me of the plea offer by the Assistant Attorney General and he has provided me a written copy of that offer. (Attachment).
>
> 12.    I acknowledge that I have known about this offer for many months and that I have had ample opportunity to consider this plea offer made to me.

13.     I acknowledge that my attorney had advised me that based upon his 44 years of experience, he believes there is a substantial likelihood that I will be found guilty of many, if not all of these offenses and that I will receive a substantial sentence to prison. I will not be eligible for probation and that I will be required to serve the sentence in prison.

14.     I have told my attorney that I do not believe that [A.L.] will testify in my case. My attorney has told me that he strongly believes the prosecutor will insure that [A.L.] will testify and I will be convicted. I do not agree with my attorney.

15.     I acknowledge my attorney's advice but I do not want to enter into any plea agreement that requires me to go to prison.

16.     My attorney has told me that the Attorney General will not make any agreement that does not include a prison sentence.

Appellate counsel worked in the Knox County Public Defender's Community Law Office as the "primary appellate attorney." At the time of the post-conviction hearing, he had handled hundreds of cases and conducted more than twenty jury trials. Appellate counsel was appointed to Petitioner's case after sentencing in 2018. He met with Petitioner on a few occasions and communicated with him by phone and letter to keep Petitioner "in the loop" about his appeal. Appellate counsel reviewed the trial transcripts as was his "usual practice" to identify anything "potentially problematic" and prepared the lengthy amended motion for new trial which was denied by the trial court. After that, appellate counsel filed a notice of appeal and "worked to narrow down the most viable issues in order to present them in-depth through the briefing process[.]" Appellate counsel noted that he had concerns as to the "vigorousness" of trial counsel's work on Petitioner's behalf.

Appellate counsel testified that shortly after the jury had been sworn, "juror No. 2" ("Juror 2") told a court officer that he had been sexually molested as a child by a stepbrother. The issue was then brought to the attention of the trial court. The trial transcript reflected that at the beginning of voir dire, the trial court informed the first round of jurors seated in the jury box that prior experience with sexual abuse would not necessarily disqualify them from serving on the jury, unless it impacted their ability to "reach a fair and just verdict." The trial court asked the following: "[D]o any of you have anything in your history or a close family member's history related to these type[s] of allegations that you think would affect your ability to be fair and impartial in this case?" Thereafter, the prosecutor instructed the jurors outside the jury box to "pay attention" to her questions, some of which addressed personal experiences with sexual abuse.

After Juror 2 was seated in the jury box, the prosecutor asked the new jurors the following: "[D]id you guys hear everything that I asked everybody else? You paid really, really good attention. I don't need to go over everything again, isn't that right?" The prosecutor also asked if the new jurors would be comfortable with hearing and deliberating on a case involving sexual abuse. The jury was then sworn with Juror 2 on the panel. Before the trial began, the trial court announced that a court officer had brought the following issue to its attention:

> At lunchtime [Juror 2], told Investigator Coker [sic] that he had had some incident in his past that he just wanted to disclose, and so I think we need to bring him in here, find out what that's about, make sure it's not going to affect his ability to sit as a juror in this case. So what I'm going to do is I'm going to have him come up here to the bench and just have the lawyers with me the same way we've done everybody else so we don't treat him different.

Juror 2 then told the trial court that an "older stepbrother . . . kind of took advantage" of him when he was ten to thirteen years old. He further said that it only happened one time, and he never told anyone. Juror 2 specifically said that this would not impact his ability to be fair.

When Juror 2 left the courtroom, the trial court asked both parties if they had an issue with him remaining on the jury. The prosecutor said: "I mean, he says he can be fair, which I get, but I think if this had come out in jury selection, there's no way he would have ended up on the jury." The prosecutor and trial counsel agreed that they would have both struck Juror 2 if they had known about the allegation. However, the trial court noted that it did not seem that Juror 2 was trying to hide anything during voir dire "or he wouldn't have brought it up[.]" The trial court further said: "I don't think there's anything to do . . . the only thing I could possibly do would be strike him for cause, and I don't think we have cause since he says he can be fair and impartial." The trial court noted that Juror 2 was "pretty calm," brought up the issue on his own, and was not "at all" emotional about it. Trial counsel then asked the trial court to talk with Juror 2 again before jury deliberations and said, "I hate to say this, but that might fix it." The trial court agreed to "keep an eye" on Juror 2, and trial counsel said, "Hate – I hate to be fair."

Juror 2 was called back into the courtroom at the close of proof, and the trial court asked him: "Without saying anything at all about your opinions about the facts of the case or anything like that, do you feel like you can continue on and set aside any issues in the past and judge this case based upon the merits in this - - that you've heard in here?" Juror 2 replied, "Absolutely." Neither the State nor trial counsel asked Juror 2 any further questions, and he rejoined the other jurors for deliberations.

Appellate counsel testified that based on his training and experience, he could not "conceive of any reason why a defense attorney would be okay with a juror who has a history of being abused sexually as a child sitting in their case." It was pointed out that Juror 2 was the same age as A.L. when his older stepbrother "took advantage" of him. When asked why he did not raise the juror issue on appeal, appellate counsel testified:

So as I - - as I said - - or maybe I didn't say - - I included that in the motion for new trial because it was something that gave me concern when I read the trial transcript that it did not seem that he was a juror that, even with his protestations of fairness, should be on this jury. I included it in the motion for new trial. When I came to write the appellate brief, I focused - - or it became a greater concern to me not merely that [trial counsel] had not objected directly to [Juror 2] being on the jury. I often raise some sort of un-objected-to issue under plain error. I almost always lose them. But I at least raise them.

But that in his comments to the Court it seemed to me that [trial counsel] had gone beyond not raising the issue but had actually affirmatively agreed with the trial court's resolution of the problem that I believe that his statement that the appellate court was going to say that when he said, "I hate to be - - hate to be fair," "I hate that's gonna fix it," that he was not merely failing to object. He was agreeing with what the trial court was doing.

In that situation, it seemed to me that was a post-conviction issue rather than a direct appeal issue, and I did not want to inadvertently, by putting it in there under a plain error standard that I was inevitably going to lose because of his sort of affirmative acquiescence, I didn't want to complicate any ability of [Petitioner] to raise that issue on a later form.

On cross-examination, appellate counsel agreed that he wanted to limit Petitioner's appeal to the most viable issues and not raise every single issue. Concerning the issue with Juror 2, he said:

So I think I could see the Court of Criminal Appeals resolving it two ways. One was - - would be that this, in essence, was [trial counsel's] own request that what he wanted happened, and so how can we claim error at all. If the CCA did not approach it that way but allowed me - - or evaluated a traditional plain error claim, one of the grounds for plain error that is always very difficult to show because of it's not something that's normally going to be on the transcript is in addition to showing that error is clear, have to convince

the appellate court that there was no strategic or tactical justification or reason for why there was no objection.

And here I think it would - - that would be hard in the abstract, I think it would be impossible where [trial counsel] was, in fact, going along affirmatively with what the judge was saying.

Appellate counsel noted that plain error was not the same as ineffective assistance of counsel. He further said that "once you lose a claim on plain error on direct appeal, I believe that makes an ineffective assistance claim on that same basis more difficult because the appellate court may discuss it in a way that essentially precludes you from presenting that as a[n] IAC claim."

Petitioner testified that he retained trial counsel to represent him based on a recommendation from acquaintances. He said that he met with trial counsel "mostly to pay him," and they discussed the case twice. Petitioner testified that trial counsel did not interview any witnesses on his behalf or discuss the State's witnesses with him. He said that trial counsel gave him the flash drive and a CD containing discovery and told him to take it home and look at it; however, he did not have a computer to do so. He also said that trial counsel told him it was "my word against hers."

Petitioner testified that trial counsel did not review the text messages or A.L.'s forensic statement with him. He identified the "Acknowledgement of Plea Offer and Advice of My Attorney" form and agreed that trial counsel gave it to him, and he signed it. Petitioner testified that trial counsel said he thought Petitioner would be found guilty if the case went to trial and that he would be sentenced to "more than a hundred years." He claimed that trial counsel did not advise him that he could be sentenced from thirty to more than sixty years as reflected in the plea offer document. He further claimed that trial counsel never mentioned his defense and suggested that he not testify. However, he never told trial counsel that he did not want to testify as was reflected in the plea offer document.

Petitioner testified that he never saw a written copy of the State's plea offer although the plea offer document indicated that it was included as an attachment. Petitioner testified that trial counsel told him that there was a plea offer for twenty-five years. He said that the offer was made "early on" and that trial counsel at one point told him "that there was no evidence against [him] whatsoever. So [he] shouldn't take any plea deal." Petitioner admitted to telling trial counsel he did not believe that A.L. would testify against him. He said that trial counsel did not review any of the evidence with him, and he and his family thought that he was eligible for probation when he went to trial. Petitioner testified that he did not make a knowing, intelligent, or voluntary decision about the plea offer based on

information that he was given by trial counsel. He would have made a different decision if he had known what he knew at the time of the post-conviction hearing.

The post-conviction court denied post-conviction relief concerning each claim raised by Petitioner, concluding that there was no deficient performance nor prejudice. It is from this denial that Petitioner now appeals.

**Analysis**

Petitioner argues that trial counsel was ineffective by failing to object to the State's closing argument, failing to adequately advise him concerning the State's plea offer, and failing to move to exclude discovery received on the eve of trial. Petitioner further argues that appellate counsel was ineffective for failing to raise the issue on direct appeal of Juror 2 remaining on the jury. The State contends that Petitioner received the effective assistance of counsel both at trial and on appeal.

The right to the effective assistance of counsel is safeguarded by both the Constitution of the United States and the Constitution of Tennessee; therefore, it is cognizable under the Post-Conviction Relief Act. U.S. CONST. amend VI; TENN. CONST. art. I, § 9; T.C.A. § 40-30-103 ("Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."). A petitioner alleging the ineffective assistance of counsel "shall have the burden of proving the allegations of fact by clear and convincing evidence." T.C.A. § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 291 (Tenn. 2009). Whether a petitioner asserts ineffective assistance of trial or appellate counsel, he bears the burden of showing that (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Butler v. State*, 789 S.W.2d 898, 899 (Tenn. 1990). Failure to satisfy either prong is sufficient to deny relief. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004); *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) ("[I]f this Court determines that either prong is not met, we may forego consideration of the other prong.").

A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Pylant v. State*, 263 S.W.3d 854, 867-68 (Tenn. 2008) (citing *Finch*, 226 S.W.3d at 315). Thus, an appellate court is bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings; but the post-conviction court's application of law to those factual findings is reviewed de novo with no presumption of correctness. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (citing *Dellinger*, 279 S.W.3d at 293); *State v. Fields*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

The test for ineffective assistance of counsel is the same for both trial and appellate counsel. *Strickland*, 466 U.S. at 687; *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995). Namely, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Campbell*, 904 S.W.2d at 597; *see also Carpenter*, 126 S.W.3d at 886-88.

The determination of which issues to raise on appeal is within the discretion of appellate counsel and "appellate counsel is not required to raise all issues that a defendant desires to raise on appeal." *Howard v. State*, 604 S.W.3d 53, 62 (Tenn. 2020); *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993). In fact, "experienced advocates 'have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible[.]'" *Cooper*, 849 S.W.2d at 747 (quoting *Jones v. Barnes*, 466 U.S. 745, 751 (1983)). When a petitioner alleges ineffective assistance of counsel based on the failure to raise an issue on appeal, the appellate court must determine the merits of the unraised issue. *Carpenter*, 126 S.W.3d at 887; *see also Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999) (stating that counsel's performance cannot be deficient for failing to raise a meritless issue). To determine the merits, the appellate court should consider the following non-exhaustive list of questions:

1) Were the omitted issues "significant and obvious"?

2) Was there arguably contrary authority on the omitted issues?

3) Were the omitted issues clearly stronger than those presented?

4) Were the omitted issues objected to at trial?

5) Were the trial court's rulings subject to deference on appeal?

6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7) What was appellate counsel's level of experience and expertise?

8) Did the petitioner and appellate counsel meet and go over possible issues?

9) Is there evidence that counsel reviewed all the facts?

10) Were the omitted issues dealt with in other assignments of error?

11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Carpenter*, 126 S.W.3d at 888 (quoting *Mapes*, 171 F.3d at 427-28). This court has held that the best way to convince the post-conviction court and the appellate court that an omitted issue had merit is to present a legal argument for the omitted issue. *McNutt v. State*, No. W2016-01086-CCA-R3-PC, 2017 WL 4004172, at *7 (Tenn. Crim. App. Sept. 8, 2017).

First, Petitioner contends that trial counsel rendered deficient performance by failing to object to the State's closing argument because the prosecutor improperly vouched for "witness credibility." More specifically, Petitioner complains about the following statement during closing argument:

> You've seen the text messages. You've seen the poems. You've seen the receipts. You've seen the rings. You've seen the letter about the rings. You've seen all of that, and on top of all that, you heard [A.L.] confirm everything. You heard her yesterday. She confirmed every bit of that physical evidence that you saw.

Petitioner contends that the prosecutor continued vouching for A.L. and her mother by stating:

> But if this is about mom, if mom's the one that made this up, if mom got [A.L.] to say all these things, use your common sense, how incredibly convenient is it that she decides, you know what, I'm going to convince my daughter to say that she had this relationship with this man that I'm mad at, this - - her stepfather. How incredibly convenient it is that she just happens to find all these text messages where they're talking about sexual acts. She is the luckiest estranged wife ever that all those things just happen to be there, that there's a note talking about a promise ring, that he's putting letters in her backpack about how he loved her before she started to mature. Let's think about that. He knew exactly how old she was, not 'cause he raised her, but because he wrote a poem talking about how he loved her before she started to mature, when she was a child. And mom just got lucky? No. No.
>
> Okay. So why does [A.L.] make it up? Because she wants this relationship back with her parents? Think about it. He is the one constant in her life. Why in the world is she making something up against the one person she has a good relationship with? You heard her testify.

- 15 -

Petitioner further argues that the prosecutor vouched for A.L.'s credibility by asking the jury why A.L. turned on "the one person that's there for her, the one person that's been there for her, her softball coach[.] . . . Does that make sense to you? Use your common sense." The prosecutor also stated that "in deciding if she's fabricating this, well, let's think about the details. . . . If this is something that [A.L.'s mother] has put her up to, think about the details that she gave[.]"

Finally, Petitioner argues that the prosecutor improperly vouched for A.L.'s credibility by stating:

[A.L.'s mother] said, "Yeah, he's uncircumcised."

Okay. Well, did she feed that to [A.L.]? 'Cause [A.L.] didn't get up here and say he's uncircumcised. [A.L.] talked to you like a child. She said, "He told me once that he had extra skin because there was something that was supposed to happen to him as a baby and it didn't." If [A.L.'s mother] fed her this information, she's going to get up there and say, "He was uncircumcised." But instead she says, "He told me how when he was a baby, something was supposed to happen. They were supposed to take that extra skin off and they didn't."

The prosecutor then asked the jury: "[t]his 16-year-old girl sat in that chair and talked to you about how this man anally raped her. Is that what she chooses to make up?"

The post-conviction court found that Petitioner failed to establish either deficient performance or prejudice as to this issue. The court pointed out that the statements by the prosecutor did not constitute improper vouching and concluded that the prosecutor did not express a personal opinion or imply that the State had found A.L. to be credible. "Rather, the [prosecutor] appealed to the evidence elicited during the trial and made arguments based upon the evidence and common sense as to why the jury should find [A.L.] credible in her allegations."

Initially, to the extent Petitioner argues that the prosecutor improperly vouched for A.L.'s mother's testimony, we agree with the State that this issue is waived because it was not included in the post-conviction petition and is being raised for the first time on appeal. "[A]n issue raised for the first time on appeal is waived." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

The record does not preponderate against the post-conviction court's findings that the prosecutor did not improperly vouch for A.L.'s credibility. "Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit

the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *State v. Henley*, 774 S.W.2d 908, 911 (Tenn. 1989). Improper vouching occurs when a prosecutor expresses his or her personal opinion as to a witness's credibility. *See State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012); *State v. Goltz*, 111 S.W.3d 1, 6-7 (Tenn. Crim. App. 2003). In this case, the prosecutor did not express her personal opinion as to A.L.'s credibility. She summarized the evidence and pointed out how the evidence corroborated A.L.'s testimony. The statements that Petitioner contends were improper were made in response to Petitioner's closing argument suggesting that A.L. and her mother had fabricated the allegations against him. The prosecutor highlighted evidence presented at trial to rebut this claim and show that A.L. was credible based on reasonable inferences that could be drawn from the evidence. The Tennessee Supreme Court has noted that it is proper to point to "specific evidence which tended to" reflect on witness credibility. *Sexton*, 368 S.W.3d at 420.

Furthermore, Petitioner cannot demonstrate that he was prejudiced by trial counsel's failure to object to the prosecutor's statements. Even if trial counsel had objected, Petitioner has not shown that an objection would have been sustained because the prosecutor's comments were not an improper expression of her personal belief as to A.L.'s credibility. He has also failed to demonstrate that he would have received relief from this court on appeal under plenary review. *Cf. Carpenter*, 126 S.W.3d at 887-88 ("When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim."). Petitioner is not entitled to relief on this issue.

Second, Petitioner asserts that trial counsel rendered deficient performance by failing to "adequately advise [him] of nearly every aspect surrounding the State's plea offer." Concerning this issue, the post-conviction court found:

> The court initially notes that no proof of a formal offer has been presented to the court, although it appears that [trial counsel] did speak to the Petitioner about possible plea deals. The document referencing an offer does not contain the actual offer. The court does not find the Petitioner to be credible when he claims there was an offer for 25 years. The prosecutor stated that there was an informal discussion about 75 years, but no formal offers were recorded in the State's file.

> As stated above in the findings of fact section, [trial counsel] clearly advised the Petitioner that he was facing a very lengthy prison sentence and would likely be convicted. The court finds that the Petitioner completely understood the consequences of going to trial and rejected any plea involving a prison sentence because he thought [A.L.] would not appear to testify. Although the Petitioner testified that had he known then what he knows now,

- 17 -

he would have made a different decision, the court finds that this is not supported by the record. The Petitioner has failed to establish that trial counsel was deficient in giving advice regarding plea negotiations.

The post-conviction court further considered whether Petitioner was prejudiced by trial counsel's performance during plea negotiations and concluded that Petitioner would not have accepted any offer other than probation. "Additionally, the court does not believe any formal offer had ever been made by the State, nor would it have made any probationary offer or even an offer of 25 years to serve. The court finds that the Petitioner has also failed to establish prejudice."

We note that after the post-conviction court entered its order denying the post-conviction petition, Petitioner filed a motion to late-file an exhibit to the post-conviction hearing consisting of an undated email from Ms. Russell discovered in trial counsel's case file containing the following:

Here is the plea offer on [Petitioner]:

Ct 1: Agg Sexual Battery – 25 years at 100% as a Range 3 Offender
Ct 2: Solicitation of a Minor – 6 years at 30%
Ct 3 through Ct. 27 – Dismiss per the plea agreement
Ct 28 through Ct 38 – 25 years at 100% as a Range 3 Offender

The offer was silent as to whether the counts would run concurrently or consecutively. In its order denying Petitioner's motion to late-file the exhibit, the post-conviction court stated: "In any event, assuming that the proposed exhibit was true and accurate, the court finds it would not have changed the court's ruling."

The record does not preponderate against the post-conviction court's findings concerning this issue. "The *Strickland* standard for determining whether a defendant received effective assistance of counsel applies during plea negotiations as well as during trial." *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014) (citing *Missouri v. Frye*, 566 U.S. 134, 144-45 (2012)). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. A defendant claiming trial counsel's performance was deficient in the plea negotiations process has the burden to show by a reasonable probability that, but for trial counsel's deficiency, (1) the defendant would have accepted the plea offer if properly conveyed, (2) the offer would not have been withdrawn by the prosecution, and (3) the trial court would have accepted the offer and imposed a less severe penalty than was imposed. *Nesbit*, 452 S.W.3d at 800-01 (citing *Lafler v. Cooper*, 566 U.S. 156, 164 (2012)).

- 18 -

The record supports the post-conviction court's determination that Petitioner failed to demonstrate that trial counsel's performance was deficient concerning plea negotiations nor that he was prejudiced by trial counsel's performance because there is nothing in the record to show that Petitioner would have accepted the offer. The record in this case does not contain a formal plea offer; however, Ms. Russell testified that there was an informal discussion with trial counsel. Although she could not recall the specific details of the informal offer, her case file indicated that it was for seventy-five years at 100% service. Petitioner signed an "Acknowledgment of Plea Offer and Advice of My Attorney" document acknowledging that trial counsel advised him of a plea offer from the State, indicating that the plea offer was attached and that Petitioner was provided with a written copy of the offer. However, no attachment or written offer was introduced at the post-conviction hearing, and Petitioner claimed that he never saw one. He testified that trial counsel informed him that the offer was for twenty-five years, but the post-conviction court specifically found that Petitioner's testimony was not credible concerning this claim noting that it "did not believe" the State would have made a twenty-five year or probationary offer in this case. Although Petitioner attempted to late-file an exhibit purporting to show an offer by the State, it was rejected by the trial court and contrary to Petitioner's assertions in his brief, it did not establish that the offer was for twenty-five years or that Petitioner's sentence would have been served on probation.

Petitioner argues in his brief that trial counsel instructed him not to accept any plea offer because there was no evidence against him. Petitioner also claims that trial counsel did not explain the evidence against him or his exposure if convicted, and Petitioner and his family believed that he was eligible for probation. However, these assertions are belied by the signed "Acknowledgment of Plea Offer and Advice of My Attorney" document which stated that trial counsel advised Petitioner that there was a substantial likelihood that he would be found guilty of many, if not all, of the offenses, would receive a substantial prison sentence, and would not be eligible for probation. The document reflected that trial counsel advised Petitioner that his prison sentence could be as long as thirty years to more than sixty years. The document indicated that Petitioner did not believe that A.L. would testify against him; however, trial counsel strongly believed that the prosecutor would insure A.L. testified and that Petitioner would be convicted. In the document, Petitioner acknowledged trial counsel's advice, but he did not want to enter into any plea agreement that required him to go to prison. He acknowledged that trial counsel told him that the prosecutor would not make any agreement that did not include a prison sentence. At the post-conviction hearing, Petitioner admitted to telling trial counsel he did not believe that A.L. would testify against him. Therefore, the post-conviction court did not err in concluding that Petitioner failed to establish that trial counsel rendered deficient performance concerning plea negotiations.

- 19 -

Furthermore, the record supports the post-conviction court's determination that because Petitioner presented no proof that he would have accepted any plea offer that did not involve probation, he did not demonstrate prejudice. Although he claimed at the post-conviction hearing that he would have made a different decision if he had known then what he knew at the time of the post-conviction hearing, Petitioner never stated that he would have accepted any plea offer involving a prison sentence. Additionally, even if a twenty-five-year offer had been made, Petitioner has not demonstrated that the prosecutor would not have withdrawn the offer or that the trial court would have accepted it. Therefore, Petitioner is not entitled to relief on this issue.

Third, Petitioner argues that trial counsel rendered deficient performance by failing to object to eleven screenshots of text messages provided by Ms. Russell the week before trial or by failing to seek a continuance of the trial after receipt of the messages. Concerning this issue, the post-conviction court concluded:

> The record establishes that the State provided [trial counsel] additional incriminating text messages between the Petitioner and [A.L.] on January 13, 2018. The trial began six days later. The State had previously provided a number of similar screenshots from the same phone. The new images were not more incriminating than the other messages or the Petitioner's statements to Investigator Tipton, where he acknowledged sending messages and having sexual contact with [A.L.].
>
> Had [trial counsel] objected to the admission of the screenshots, the court would not have granted the request due to the fact that the images were similar to other messages previously provided to the defense from the same source. The defense was not prejudiced by proceeding to trial. Therefore, the court finds that Petitioner has failed to establish that trial counsel was ineffective in this area or that he suffered prejudice from the perceived ineffectiveness.

The record does not preponderate against the post-conviction court's findings. Ms. Russell testified that when she forwarded screenshots of the text messages to trial counsel, he already had all the other incriminating and sexually explicit text messages sent by Petitioner to A.L. provided in the initial discovery. She noted that trial counsel had been prepared to go forward with those text messages, and that the late discovery "wouldn't impact his trial strategy or his trial approach as, you know, these were just additional to the ones that had already been turned over." It was Ms. Russell's opinion that the additional text messages would not have affected the verdict in Petitioner's case. She further asserted that she had no reason to doubt the authenticity of the text messages, and A.L. authenticated

them at trial. Petitioner has not demonstrated that trial counsel rendered deficient performance by failing to object to the text messages or to seek a continuance.

Furthermore, Petitioner cannot show that he was prejudiced by trial counsel's performance. As pointed out by the State and the post-conviction court, the eleven screenshots of the text messages "were not any more incriminating" than the ones that had been provided in earlier discovery which in this court's opinion were much more incriminating. Therefore, even if the text messages had been excluded at trial, it would have had no impact on the verdict. Additionally, Petitioner has not demonstrated that the trial court would have excluded the text messages had Petitioner objected to them or that the court would have granted a continuance. Petitioner is not entitled to relief on this issue.

Finally, Petitioner contends that appellate counsel rendered deficient performance by failing to raise on appeal the issue of Juror 2's presence on the jury after the juror revealed prior to trial that an older stepbrother "took advantage" of him one time when he was around the same age as A.L. Concerning this issue, the post-conviction court noted that during voir dire, no questions were asked while Juror 2 was in the jury box concerning whether any of the jurors were themselves victims of sexual abuse. The subject had been addressed earlier with other jurors. The court further pointed out that the trial court and trial counsel both asked Juror 2 outside the presence of the other jurors if he could be fair, and he indicated that he could. Trial counsel did not move for Juror 2 to be stricken, and the post-conviction court found that "the record does not indicate sufficient grounds to have challenged [Juror 2] for cause."

The post-conviction court stated that since trial counsel passed away, "he was unavailable to explain his reasoning for not moving to strike [Juror 2] using . . . peremptory challenge[s]." The court further noted that trial counsel used eight peremptory challenges and seven of the eight were for females. He only struck one other male "who was related to a local prosecutor and connected to law enforcement." Concerning this issue, the post-conviction court ultimately concluded:

> In this case, the court does not find this issue to be significant and obvious. [Juror 2] indicated that he believed he could be fair and impartial. He did not indicate the nature of how he was "taken advantage of." Trial counsel appears to have had a strategy of obtaining a jury with more men than women. Ten of the 13 jurors seated in the case were, in fact, men. There is no obvious appellate issue concerning [Juror 2]. Furthermore, [trial counsel] did not attempt to challenge [Juror 2] for cause. Thus, the standard on appeal would have been plain error. The other issues raised by appellate counsel were significantly stronger.

[Appellate counsel] is a very experienced and skilled appellate attorney. He testified that he made a strategic decision not to include the juror issue on appeal. The court finds that this was a sound legal strategy. The court further notes, as argued by [the prosecutor], that the petition does not indicate that [trial counsel] was ineffective at trial for not challenging the juror, only that [appellate counsel] was ineffective for not raising the matter on appeal. Either way, the court finds that the Petitioner has failed to establish that trial and/or appellate counsel were ineffective on this issue.

The record does not preponderate against the post-conviction court's findings. Considering the *Carpenter* factors, appellate counsel was an experienced attorney working as the "primary appellate attorney" in the Knox County Public Defender's Community Law Office. At the time of the post-conviction hearing, he had handled hundreds of cases and conducted more than twenty jury trials. Appellate counsel testified that although he included the juror issue in the amended motion for new trial, he did not include it as an issue on appeal in the appellate brief. He noted that because trial counsel had agreed with the trial court's decision not to remove Juror 2 for cause, he could only raise the issue under plain error which was very difficult to show. Appellate counsel further testified that the "situation" with Juror 2 was a post-conviction issue for ineffective assistance of counsel rather than a direct appeal issue. Therefore, he did not "want to inadvertently, by putting it in there under a plain error standard that I was inevitably going to lose because of his sort of affirmative acquiescence, I didn't want to complicate any ability of [Petitioner] to raise that issue in a later form." Appellate Counsel also testified that he wanted to limit Petitioner's appeal to the most viable issues and not raise every single issue. The record supports the post-conviction court's determination that appellate counsel clearly made a tactical and strategic decision not to raise this issue; we will not second-guess that strategic decision. *Cooper*, 849 S.W.2d at 747; *see also Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *17 (Tenn. Crim. App. Jan. 11, 2012) (finding no ineffective assistance of appellate counsel when counsel did not raise an issue because it had been waived and counsel believed he would lose on appeal under plain error review). Moreover, this issue was not "significant and obvious" compared to the other issues appellate counsel chose to raise on appeal.

Furthermore, because Petitioner cannot establish that he would have been granted relief on appeal under plain error, this issue is meritless, and he cannot prove prejudice. To obtain relief under plain error, the defendant must demonstrate: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Walls*, 537 S.W.3d 892, 901 (quoting *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)).

Petitioner has not demonstrated that a clear and unequivocal rule of law was breached or that a substantial right was affected by Juror 2's presence on the jury. The record does not reflect how Juror 2's stepbrother "kind of took advantage" of him "one time." Juror 2 did not willfully conceal his history; he disclosed it before the trial began. *See Carruthers v. State*, 145 S.W.3d 85, 95 (Tenn. Crim. App. 2003) (stating that a presumption of juror bias arises "[w]hen a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality"). Additionally, the record does not show that Juror 2 was actually biased against Petitioner. The trial court asked him on two occasions if he could be fair and impartial, and Juror 2 indicated that he could. *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) ("Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced.").

Additionally, as pointed out by the post-conviction court, it cannot be shown that trial counsel did not object to Juror 2's presence on the jury for tactical reasons. The trial court noted that trial counsel had used seven of his eight peremptory challenges to remove women from the jury and seemed to have a strategy of having a jury compromised of more men than women. Petitioner is not entitled to relief on this issue.

## Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

s/ **Jill Bartee Ayers**

JILL BARTEE AYERS, JUDGE

- 23 -